# EXHIBIT 1

1    THE COURT:  Ms. Jones, would you please call the

2    case.

3    THE COURTROOM DEPUTY:  Civil Action 1:16-CV-97,

4    Samantha D. Rajapakse versus Royal Arms Apartments, et al.

5    THE COURT:  And normally I would say, "Counsel,

6    please make appearances for the record," but I'll ask the

7    plaintiff, also, to make an appearance for the record.  Why

8    don't you go first.  And -- and would you pronounce your name

9    for me, ma'am?  Yeah.

10   MS. RAJAPAKSE:  Yes.  My name is Samantha Rajapakse.

11   THE COURT:  Rajapakse.  Got it.  Okay.

12   MS. RAJAPAKSE:  And I am representing myself.

13   THE COURT:  Okay.  Thank you, ma'am.

14   MS. WELFORD:  Good morning, Your Honor.  My name is

15   Shea Welford, and I'm a member of the Memphis bar.  Pleased to

16   be here today.  I represent Lexington Asset Management, which

17   is the property management company for an apartment complex

18   known as the Royal Arms Apartment, which is named as a

19   defendant in this case.

20   THE COURT:  And is Mr. Wagner local counsel?

21   MS. WELFORD:  Mr. Wagner was counsel in this case,

22   and I've become lead counsel in this case.  I do not think he's

23   going to appear any further in this case.

24   THE COURT:  Would you tell him he needs to let -- let

25   the Court know that he's not going be counsel of record?

UNITED STATES DISTRICT COURT

1    MS. WELFORD:  Yes.

2    THE COURT:  He'll need to file a motion to withdraw

3    or somehow let's get that on the record.  Okay?

4    MS. WELFORD:  Yes, Your Honor.

5    THE COURT:  Great.  Thank you.

6    So I realize that you have driven over from Memphis

7    to be here today, but let -- this is -- this is just a status

8    conference, it's not for the purpose -- I'm not going to rule

9    from the bench on any of your pending motions, but as I was

10   reviewing the docket, the paper is accumulating here, and I

11   wanted to discuss some of these things with you.

12   MS. RAJAPAKSE:  Your Honor, may -- may I make a

13   statement before you --

14   THE COURT:  Yeah.  You may.  Go ahead.

15   MS. RAJAPAKSE:  Your Honor, as a plaintiff, I

16   would -- I need to protect my interests.  So I need to ask, is

17   there anything that the Court needs to disclose to me as far

18   as -- that would result in a conflict of interest in this case?

19   You know, with all due respect, do you know the parties, or are

20   you -- any of the parties, or are you affiliated with any of

21   the people in this case?

22   THE COURT:  Well, that's a fair question,

23   Ms. Rajapakse.  I've never met defense counsel.  I have met

24   Mike Wagner, who's apparently not going to be handling this

25   case.  I have been on the opposite -- when I was in private

1  practice, I was on the opposite side of cases with Mr. Wagner.

2  We never worked on anything together, but I defended some cases

3  that he had filed against my clients.  That's my -- the limit

4  of my relationship with Mr. Wagner.  When I was in private

5  practice, I never represented Royal Arms Apartments, Lexington

6  Asset Management.  I have actually no knowledge of either one

7  of those entities.  And I've never, to my knowledge, ever seen

8  Royal Arms Apartments.

9          So, generally if -- as a judge, if we determine that

10  we have any -- any personal relationship with the parties or

11  have ever represented any of those entities, we generally

12  would recuse ourselves, because it is important that we be

13  neutral and unbiased.  So, the answer to your question is, I

14  don't have any conflict of interest, I don't have any

15  knowledge of the parties or these entities or counsel.

16          So, now, having -- having said all that, what we

17  have pending before us, I believe, is a motion filed by

18  Ms. Rajapakse on August 25, 2016, which is a motion for

19  reconsideration of an order entered by the district court

20  judge, Judge Greer, which is docketed at Item Number 4, which

21  does several things.  One -- one of the things that that order

22  did was to grant the plaintiff's motion for leave to proceed

23  in forma pauperis.  I don't think plaintiff is contesting

24  that.  But the order also indicated that plaintiff's claim

25  requesting relief in the form of a stay of the state court

1  proceeding and her motion for preliminary injunction to stay

2  the state court proceedings are dismissed, and then this

3  motion for reconsideration in August of 2016 apparently deals

4  with that.  That has not been ruled upon yet.

5          On September 8, Ms. Welford, you filed a motion to

6  dismiss for failure to state a claim.  That is still pending.

7  On September 29, 2016, Ms. Welford, you filed a motion for

8  protective order on behalf of Lexington Asset Management.

9  Then on October 6th, plaintiff, Ms. Rajapakse, filed a motion

10  for summary judgment with an accompanying memorandum.  On

11  October 20 Lexington Asset Management filed a motion for

12  protective order.  Then on October 24 Ms. Rajapakse filed a

13  motion to amend the complaint.  And then on -- also on

14  October 24 Ms. Rajapakse filed a motion for relief under

15  Rule 60 from judgment or order from general sessions court and

16  circuit court.  So there's a lot that the Court needs to deal

17  with here, and we will.

18          And let me -- while I've got you here, though, and

19  before I set up any -- go any further on how we're going to

20  handle all these outstanding motions, I'm going to ask

21  Ms. Welford first to address this issue.

22          Would you -- would you stand?  And tell me the

23  status—and you may have to go into some background—of the

24  state court proceedings --

25          MS. WELFORD:  Yes, Your Honor.

```
1          THE COURT:  -- that --
2          MS. WELFORD:  I don't know your procedure in Your
3   Honor's courtroom --
4          THE COURT:  You can stand there, or you can address
5   me from the podium, whichever you feel more comfortable doing.
6          MS. WELFORD:  I'll do that from the podium, so I can
7   read the --
8          THE COURT:  Sure.
9          (Brief pause.)
10          THE COURT:  Ms. Rajapakse, after Ms. Welford
11   addresses these issues, I'm going to give you an opportunity to
12   respond.
13          MS. RAJAPAKSE:  Okay.
14          THE COURT:  Okay?  That's normally how we do it over
15   here.
16          MS. WELFORD:  Your Honor, this is the third case
17   arising out of these same transactions or occurrences, which,
18   just by way of brief background, is the rental of,
19   Ms. Rajapakse's residing in and eviction from an apartment at
20   Royal Arms Apartments.  So all three cases arise out of that
21   same transaction or occurrence.
22          The first case was filed by Ms. Rajapakse on
23   December 21st, 2015, in the Hamilton County General Sessions
24   Court.  And we attached that complaint that Ms. Rajapakse
25   filed, which was actually a very detailed complaint, to our
```

1    motion to dismiss.  And in that, Your Honor, you can see that

2    the allegations of that complaint overlap substantially with

3    the complaint that's now pending before this Court.  That went

4    to trial on February 2nd, 2016.  There was a judgment entered

5    for the defendant.  The plaintiff, Ms. Rajapakse, appealed.

6    On April the 7th of 2016 the circuit court dismissed the case

7    on a 12.026 motion to dismiss on the basis of res judicata.

8    There was no appeal from--  There was an appeal from that.

9           THE COURT:  Hang on just a second.  So the case was

10   tried in sessions court --

11          MS. WELFORD:  Correct.

12          THE COURT:  -- appealed within -- is it 30 days, or

13   14 days?

14          MS. WELFORD:  Ten days, I believe.

15          THE COURT:  Ten days, yeah.  Been a long time.

16          MS. WELFORD:  Yes.

17          THE COURT:  So it would have been appealed to circuit

18   court, and, as I recall, and, again, I'm stretching a bit, but

19   it's -- isn't it a de novo review in circuit court?

20          MS. WELFORD:  It's de novo, Your Honor.

21          THE COURT:  I guess I'm a little confused as to why

22   there would be res judicata if there -- she's entitled to a

23   de novo review in circuit court.

24          MS. WELFORD:  So what happened, Your Honor -- and

25   Ms. Rajapakse was given the opportunity to address that

1    question at the Court of Appeals, but I -- let me digress.

2    There was an eviction proceeding also filed.  Ms. Rajapakse

3    brought those same claims back, the motion in the eviction

4    proceeding that she brought in her first case that she had

5    filed.  So you have the state court proceeding filed by

6    Ms. Rajapakse alleging all these bad things that happened with

7    respect to her rental and stay and eviction from Royal Arms,

8    and Royal Arms had filed an eviction proceeding at the same

9    time.

10           THE COURT:  Is that under the Tennessee Uniform

11   Landlord -- what is it called?

12           MS. WELFORD:  Tennessee Uniform Landlord-Tenant Act.

13           THE COURT:  Yeah.

14           MS. WELFORD:  I don't believe that was part of Royal

15   Arms' claims, but Ms. Rajapakse did raise those.

16           THE COURT:  Okay.

17           MS. WELFORD:  There was a trial on -- same time, Your

18   Honor, February 2nd.  So these two cases were filed together --

19   were tried together.

20           THE COURT:  Lexington, or Royal Arms, sued

21   Ms. Rajapakse to evict her?

22           MS. WELFORD:  Correct.

23           THE COURT:  She sued them for a variety of -- of

24   claims relating to her conditions and so forth --

25           MS. WELFORD:  Correct.

Case 1:21-cv-00158-CLC-CHS   Document 11-1   Filed 08/31/21   Page 7 of 44   PageID #: 62

1          THE COURT: -- and I'm -- and the eviction, I assume?

2          MS. WELFORD: That's correct.

3          THE COURT: So all of those claims were-- It wasn't

4 a claim and counterclaim, it was more -- it was two different

5 competing lawsuits?

6          MS. WELFORD: And that's what-- So, to move forward,

7 there were two lawsuits tried on the same day --

8          THE COURT: Um-hmm.

9          MS. WELFORD: -- February 2nd, and judgment entered

10 on the same day.

11         THE COURT: Um-hmm.

12         MS. WELFORD: Ms. Rajapakse appealed the case she

13 filed.

14         THE COURT: Not -- not the eviction claim that you

15 guy -- that Lexington filed?

16         MS. WELFORD: Correct. She did not appeal the

17 eviction claim that Lexington filed. So the eviction

18 proceeding case became final. Ms. Rajapakse's case moved on to

19 the circuit court for, as you're correct, Your Honor, de novo

20 review. There was a 12.026 motion brought on the basis of res

21 judicata because that eviction proceeding was not appealed.

22 The Hamilton County Circuit Court granted that motion.

23         THE COURT: Hmm.

24         MS. WELFORD: It was dismissed. Ms. Rajapakse then

25 appealed to the Tennessee Court of Appeals.

1          THE COURT:  Um-hmm.

2          MS. WELFORD:  While that appeal was pending, Your

3     Honor, and before any briefing had begun -- had been done, the

4     complaint in this case was filed on April 18th.  There was the

5     screening order that was entered on April the 28th.

6     Ms. Rajapakse filed an amended complaint on August 22nd.  We

7     filed our motion to dismiss on September 8th.  And that's

8     important, Your Honor, that date, because Ms. Rajapakse had --

9     I had consulted with her about the motion to dismiss, explained

10    that we were filing a motion to dismiss on the basis of res

11    judicata because of the eviction and because of her state court

12    proceeding.

13         THE COURT:  What -- what's the status of the

14    Tennessee Court of Appeals?

15         MS. WELFORD:  The Tennessee Court of Appeals entered

16    an order on September 9th, the day after we filed our motion in

17    this case, dismissing Ms. Rajapakse's appeal.  And we filed a

18    supplement, Your Honor, to our motion to dismiss --

19         THE COURT:  Okay.

20         MS. WELFORD:  -- with that order.  So, the two

21    underlying actions having to do with this rental and the

22    problems that Ms. Rajapakse alleges were associated with it

23    were determined first in the eviction and her separate state

24    court proceedings that were tried together.  Then the state

25    court proceeding went up on appeal.  That has been dismissed.

Case 1:21-cv-00158-CLC-CHS   Document 11-1   Filed 08/31/21   Page 9 of 44   PageID #: 64

1  Both of those are final.  Both of those judgments are final,

2  Your Honor.  Is there any other procedural --

3           THE COURT:  Yes.  Two questions.  Are there any new

4  legal claims in the federal court proceeding that were not

5  earlier raised in the state court proceeding?

6           MS. WELFORD:  There are, Your Honor.  There is a Fair

7  Housing Act claim that Ms. Rajapakse, in the state court

8  proceeding, did not name it as a Fair Housing Act claim.  And

9  also while Ms. Rajapakse made allegations regarding breach of

10  the lease agreement, that was not actually set forth as a claim

11  for breach of the lease agreement, as far as I can tell in the

12  state court proceeding.

13           Your Honor, on that note, in determining, for

14  res judicata purposes, the federal courts are instructed to

15  look at Tennessee -- or state court law.  And in Tennessee,

16  the Tennessee Supreme Court says if you've got a court of

17  competent jurisdiction, the same parties or other privy, same

18  causes of action asserted, and the underlying (inaudible),

19  judgment is final and you've got res judicata.  So your

20  question going to causes of action goes right to the heart of

21  it, Your Honor, and in Tennessee the Supreme Court has adopted

22  what's called a transactional approach in the *Creech vs.*

23  *Addington* case.  That's cited in our brief.  And in that it's

24  -- they don't look at did you assert this statutory claim or

25  this breach of contract claim, they say under the

```
 1   transactional approach two suits will be deemed to have the

 2   same cause of action for res judicata purposes if they arise

 3   out of the same transaction or series of transactions or

 4   connected transactions.  So that's what cause of action --

 5   it's used in a broader sense than -- than we may use it as

 6   Count 1, Count 2, Count 3, and the reason for that, Your

 7   Honor, is because the theory is that res judicata bars a

 8   second suit, or third in this case, between the same parties

 9   for all claims that were or could have been brought in the

10   prior proceedings.

11         And, Your Honor, Tennessee law recognizes, and it's

12   in the statute under the Fair Housing Act, those claims can be

13   brought in state court, they may be asserted as defenses to

14   eviction proceedings, to any type of proceedings that the

15   landlord has brought.  And all of these -- when you compare

16   the complaints, all of the allegations that Ms. Rajapakse

17   makes, which are charging too much for the security deposit,

18   excessive noise from dogs barking, odors of dog urine,

19   rodents, improper eviction, all of that is the same

20   transaction -- reporting on her credit that she was not making

21   rental payments, all of that, those are the same complaints

22   made in the prior two proceedings, Your Honor.

23         THE COURT:  Let me ask you this:  Again, I'm reaching

24   back, but in sessions court, to file a complaint, it's a very

25   bare bones process, as I recall, and then you just write that
```

1  "They treated me unfairly, and I'm suing them," and essentially

2  that gets you a hearing.  Did she--  I don't know how detailed

3  her sessions court -- is it called the civil warrant that --

4          MS. WELFORD:  Yes, Your Honor.  Civil warrant.

5          THE COURT:  Yeah.  Yeah.  So after--  How detailed

6  was that?  And then did she later amend her complaint when she

7  got to circuit court?

8          MS. WELFORD:  Your Honor, the complaint that

9  Ms. Rajapakse filed was very detailed.  It's attached as

10 Exhibit A to our memorandum in support of our motion to

11 dismiss.

12         THE COURT:  When you say "complaint," is that general

13 sessions, or circuit?

14         MS. WELFORD:  It's the -- it is the general sessions

15 complaint.

16         THE COURT:  Okay.

17         MS. WELFORD:  And so it goes on, Your Honor -- it's

18 unusual, because, as Your Honor well knows, it's a general

19 sessions warrant that's usually filed that's one page, but this

20 is a ten-page --

21         THE COURT:  Um-hmm.

22         MS. WELFORD:  -- complaint, very detailed.  And this

23 was appealed up to circuit court.  I don't think a new

24 complaint was filed in circuit court, but there were filings

25 called -- you're not required to refile the complaint in

1  circuit court when you appeal it from sessions, but there were

2  other documents filed by Ms. Rajapakse in addition to this very

3  detailed general sessions complaint styled motions or requests

4  for certain relief that also recited these facts.

5           THE COURT:  Okay.

6           MS. WELFORD:  And in the *Love* case, Your Honor——and I

7  think we cited that case; I'm looking for my cite right

8  now——the court in Tennessee has recognized that general

9  sessions judgments are to be considered res -- for res judicata

10 purposes.

11          THE COURT:  You've referenced some of the factual

12 allegations that Ms. Rajapakse had, such as dog urine and

13 excessive noise and reporting -- damaging her credit by

14 reporting late rental payments, and I'm sure there are many

15 others, but were there -- are there any factual allegations,

16 substantive factual allegations, in the federal court complaint

17 that were not litigated in the state court?

18          MS. WELFORD:  Your Honor, I don't believe so.  They

19 don't track each other exactly.

20          THE COURT:  Right.

21          MS. WELFORD:  So there -- I don't want to represent

22 to the Court that there's not a sentence in there that wasn't.

23          THE COURT:  Um-hmm.

24          MS. WELFORD:  The concepts were all there, that the

25 beginning of the rental was improper, during the time that she

1   rented there were problems, and that was done on a basis of

2   improper motive because of her race, then there was the

3   post-eviction reporting and those types of things.  So they're

4   very similar.  I'm not going to represent to the Court that

5   there's not a sentence in there that's different.

6           THE COURT:  Right.

7           MS. WELFORD:  But if there is, Your Honor, I would

8   point back to the res judicata under Tennessee law which says

9   if you could have brought it --

10          THE COURT:  Yeah.

11          MS. WELFORD:  There's-- Let me-- This might be an

12  easier way to say it.  There's nothing in the federal court

13  complaint, from a time-wise perspective, that couldn't have

14  been raised back in state court.  It's all based on that time

15  period.

16          THE COURT:  The Fair Housing Act, this is not an area

17  that I dealt in in private practice.  Is it -- it's a federal

18  statute, and that's why we're over here?

19          MS. WELFORD:  Correct.

20          THE COURT:  That's the sole basis for federal

21  jurisdiction?

22          MS. WELFORD:  So Judge Greer dismissed all of the

23  other claims except for the Fair Housing Act claim, as part of

24  the screening process.  Ms. Rajapakse has made a motion to

25  amend, I think, to bring a Fair Debt Collection Practices Act

1   or Fair Credit Reporting Act claim and a breach of lease claim

2   that has not been screened, Your Honor, all still arising out

3   of that same transaction or occurrence.

4           THE COURT:  Okay.  She didn't raise a Fair Housing

5   Act claim specifically in her state court action?

6           MS. WELFORD:  Right.  There was not--  It was not--

7   The statute wasn't cited.

8           THE COURT:  Right.  You would say it's the same

9   operative facts, just a different legal theory that she's

10  traveling under now.

11          MS. WELFORD:  Correct.  And I've -- in reading it, I

12  think you could even say there's a fair reading that as a pro

13  se plaintiff she might have been trying to assert that claim,

14  but as -- when you look at the pleading standards that you have

15  to cite the actual statute to state that cause of action, I

16  would say she has not done that.

17          THE COURT:  Okay.  And, Ms. Welford, tell me about

18  your -- I'm sorry, I read all the pending motions; you've -- a

19  motion for protective order.  Is that right?

20          MS. WELFORD:  That's correct, Your Honor.  So --

21          THE COURT:  It's a bit unusual, but...

22          MS. WELFORD:  It is, Your Honor.

23          THE COURT:  Tell me about that.

24          MS. WELFORD:  And I -- and I'll say it's because this

25  case is a little bit unusual, Your Honor.  This is the third

1    time that my client has had to go to court regarding

2    Ms. Rajapakse.  Like I have told Your Honor, there were the

3    eviction proceedings, and then there's Ms. Rajapakse's separate

4    state court proceeding, and those proceedings have been

5    concluded.  The filings that have been made by Ms. Rajapakse

6    would require substantial time and effort to try to put into a

7    form to be able to respond to.  And the Sixth Circuit, Your

8    Honor, has said, as a preliminary matter, that it is within

9    your sound discretion to determine whether or not those types

10   of matters should be stayed in certain instances.  And the

11   *Gettings* case that we relied on, Your Honor, dealt with

12   qualified immunity.  In that case the reasoning, I think,

13   applies.  The court said when you have a case that further

14   discovery or motions are not going to affect the ruling that

15   could take out the entire case, then the Court, in its sound

16   discretion, may stay those other proceedings while it reviews

17   that issue to determine whether or not that's going to dispose

18   of the entire matter.  And, Your Honor, I would submit -- I

19   understand, for qualified immunity, why that would be the case,

20   because someone shouldn't have to defend and pay attorney's

21   fees for something they're not going to have to ultimately be a

22   part of, and I would say that's even more applicable here where

23   you've got res judicata, it's not going to be affected by

24   whether or not we fuss over the form of her -- what style the

25   summary judgment or whether the discovery requests were

UNITED STATES DISTRICT COURT

1    appropriate, and go through all that.  The motion on res
2    judicata is similar, Your Honor, because it has the -- the --
3    it will dispose of the entire -- the entire matter if granted.
4    And what the Sixth Circuit actually said was, limitations on
5    discovery are appropriate when claims may be dismissed on the
6    basis of a legal determination that will not be affected by
7    further discovery.  And that's just within the discretion of
8    how the trial court wants to handle its docket.  And I would
9    ask that that be granted, at least until we have a ruling on
10   the res judicata issue, Your Honor.
11          THE COURT:  Okay.  Thank you.  Let me hear from
12   Ms. Rajapakse.  And I'm going to ask her--
13          Ms. Rajapakse, let me turn to this.  I'm going to
14   read to you my very favorite rule of civil procedure.
15   Probably not supposed to have favorites, but...  The--  Just
16   like in state court, we have rules of civil procedure that
17   govern how actions proceed in federal court.  And Rule 1 was
18   amended last year, and part of it says, "These rules should be
19   construed, administered, and employed by the Court and the
20   parties to secure the just, speedy, and inexpensive
21   determination of every action and proceeding."
22          My -- my goal is to make sure that we do justice
23   over here, but also try to -- I want to be focused on doing it
24   in such a way that it's speedy and inexpensive.  And so that's
25   kind of challenging at times, not just in this case, but in

1   most cases.  Because of the discovery that's permitted in

2   these cases, it can end up getting pretty drawn out, and there

3   are lots of -- this is not unusual for the parties to be

4   engaged in this sort of pretrial disputes over procedure.

5       Let me ask you this.  There are lots of motions

6   pending for -- on both sides, and what -- what I would like to

7   do is stop the process at this point and catch up and look at

8   every motion and make a decision on every motion.  I don't

9   want to cut that off prematurely if there is--  I'll pose the

10  same question to counsel, but it appears to me at this point

11  that you have -- both parties are filing -- have filed motions

12  asking me to rule in their favor and dismiss the case.  You

13  filed a motion for summary judgment.  She's filed a motion to

14  dismiss.  Both sides are asking me to look at the record

15  before me and to -- and basically to decide the case in your

16  favor, which is permissible.  You can -- you can ask me to do

17  that.

18      It seems to me that both sides have now presented to

19  me the information they want me to consider, and I can -- I

20  can stop any further filings and just rule on what's before

21  me.  But let me ask you -- I'm going to let you say whatever

22  you want to say, but I'm specifically interested in whether

23  you feel like there's some other document or documents you

24  need to file that would inform me about the motions that are

25  currently pending before me.

1      MS. RAJAPAKSE:  Well, Your Honor, first of all, I

2  haven't been able to -- given a chance to tell the truth, the

3  side that really actually happened.

4      THE COURT:  Um-hmm.

5      MS. RAJAPAKSE:  This is not the counsel that

6  originated the case.  It was Michael Wagner.  And I moved here

7  from Memphis to come here.  And the events that I filed in this

8  complaint took over from the time that I moved in to new

9  evidence that have occurred since then.  So it's not like it

10  just happened all at once.

11      I moved here from Memphis, and before -- when I

12  moved here, I called -- I was looking for an apartment to

13  stay, because I knew I had to have a place to stay.  And I

14  went through the advertisement, and I came upon this

15  apartment, Royal Arms.  I contacted them on the phone.  I saw

16  their website.  Their apartment looked nice, it looked clean.

17  I was moving here by myself.  I didn't have any family nor

18  friends here.  So I was looking for someone that would -- a

19  place where I could be secured.  I had never rented an

20  apartment before; I stayed in a house.

21      So when I moved here, I -- I talked to them, they

22  seemed very nice, and my intentions were to apply for the

23  apartment when I moved here, but they was telling me that

24  they -- you know, because of the way it was laid out, that

25  their apartments fill up real quick.  So in July I paid the

1   deposit.  July 2015 I paid the application.  I was told I was

2   approved.  When--  I paid a hundred dollars for -- to reserve

3   the apartment, and I'm thinking I purchased this apartment,

4   1200 square foot.

5          Now, my name is Rajapakse, and that -- and, you

6   know, it's not a common name, it's a -- a normal name.  So

7   when I--  I didn't have any problems.  The only thing they was

8   telling me is that they was waiting on the apartment to come

9   available on the 11th of September, and that I can move in

10  afterwards.  And September the 1st was the first time that

11  they saw me.  And when -- before then, they told me that it

12  wouldn't be no problem with me coming down here.  I told them

13  that I didn't know if I could find a job real quick but I was

14  going to pay the rent up three months in advance.  There was

15  no problem.  It was no problem.  It's when I got here and I

16  paid the $200, that's when I started having problems.  I

17  wasn't able to see the apartment.  At that time I was staying

18  at the extended stay, and it was costing me a lot of money.

19  So, during that time I found a job.  I moved into the

20  apartment on the 3rd of October.  On the 2nd of October is

21  when I start getting all this stuff, rodents that was coming

22  in through the exterior of the wall, you know, scratching

23  and -- through the walls going into the ventilator.  I called

24  Royal Arms then.  I let them know that I was having problems.

25  They boarded it up.  They didn't repair it.  They boarded it

1   up.

2           During the time from October till the time I stayed

3   there till December, I let them know -- even before I moved

4   down here, the day before I actually moved into Chattanooga, I

5   explained to them, "I'm going to have to come back to Memphis.

6   I may be late on my rent because I have to come back --" I was

7   only working with a -- limited money, "I have to go back to

8   Memphis to get the rest of my belongings." No problem. They

9   told me it was no problem.

10          So, as long as I-- I do believe in communicating

11  with people. So I communicated with them. When I got down

12  here, three days before I was about to move in, I was told

13  that my application wasn't approved. I had invested all this

14  money into getting into this apartment. So at that time I --

15  you know, they told me I had to come up with additional $500.

16  So I came up with it. And that made me late for October and

17  December. But I did -- I paid the late fees. I was never

18  late. It never went into eviction. But I-- During the

19  process of me staying there, I got a job working at the bank,

20  and I -- they was merging, and I was about to get on permanent

21  with them. I started working. During the middle -- from all

22  hours of the night, dogs barking, hearing thumping of the

23  furniture, couldn't go out of my apartment, I'm smelling urine

24  on the carpet that -- in the walkway. I mean, it was just

25  every night. I couldn't sleep. I'm going to work sleepy, and

1    I'm handling people accounts, deposits and payments and house

2    notes.  I have to be alert.  But I couldn't be alert.  So what

3    I did was, in December, when I was -- when I had told them

4    that -- they knew I was going to be late, they -- and I was

5    paying the late fees, I was at work, and I got a phone call

6    saying that they was going to evict me for 97 cent.

7              THE COURT:  For what?

8              MS. RAJAPAKSE:  97 cent.  That's in the -- that's in

9    my motion for summary judgment, that they was going to evict me

10   the next day for 97 cent.  In fact, they told me before they

11   even gave me the five -- five-day -- the late notice that they

12   were going to evict me the next day.  So I felt -- what I did

13   was, me knowing my legal rights, I knew the Tennessee -- the

14   Uniform Tennessee Residential Act, so I took the e-mails and I

15   gave them official notice in December that I was getting

16   ready -- my intent to leave, I was going to be gone by

17   December, so that I can move residence.  I started looking for

18   me a place to stay.  I-- At that time Royal Arms started to

19   tell everybody that I was already in the process of eviction.

20   So, what I did was, I filed -- in December the 21st I filed --

21   I did file a complaint, because by legal rights I had to

22   terminate the contract that I was under.  I had only been there

23   four months, and I had attempted to leave.  I did try to file

24   for an injunctive order, but I was -- I -- the way they did it

25   was that I filed in December, they held the case in January,

1  they continued it to February, during that they -- to the end

2  of January, I'm sorry.  At that time Royal Arms sent me an

3  eviction notice because they knew I was in the process of

4  leaving.  So in February, the 2nd, the court conjoined the

5  cases and heard it on -- on that day, and at that time the

6  judge said that I was attempting to live rent-free, and ordered

7  me to be evicted on March -- February the 12th.

8          On February the 11th I filed a notice of appeal to

9  the circuit court and I did leave.  I cleaned the place up.  I

10  left the apartment the way it was when I moved in.

11          THE COURT:  And so you lived there between September

12  and February?

13          MS. RAJAPAKSE:  I moved-- I signed the contract

14  September the 30th.  I moved in October the 1st, because I was

15  still staying at the extended stay.  And I stayed there until

16  February the 12th.

17          THE COURT:  Okay.  And when -- when you left in

18  February, was it -- did Royal Arms -- did you owe them money?

19          MS. RAJAPAKSE:  No, I did not, Your Honor.

20          THE COURT:  They didn't-- When they--

21          MS. RAJAPAKSE:  But they said that because I was --

22  they -- I was -- under the Tennessee Residential --

23          THE COURT:  Hang on, let me ask you this question.

24  They went to sessions court.  They filed a claim against you in

25  sessions court.  You filed a claim against them in sessions --

1      MS. RAJAPAKSE:  No, Your Honor.  I filed a claim

2  first.

3      THE COURT:  It doesn't matter who filed first.  But

4  both of you had claims pending in sessions court.

5      MS. RAJAPAKSE:  Yes, Your Honor.

6      THE COURT:  And they got a judgment on their claim

7  against you in sessions court?

8      MS. RAJAPAKSE:  Yes, Your Honor.

9      THE COURT:  And it was a judgment that said that they

10 had the right to evict you.  Is that correct?

11     MS. RAJAPAKSE:  Yes, Your Honor.

12     THE COURT:  Did it also say that you owed them some

13 money?

14     MS. RAJAPAKSE:  They said that I owed them for

15 January.

16     THE COURT:  Okay.  Have you paid that?

17     MS. RAJAPAKSE:  No, I haven't, Your Honor --

18     THE COURT:  Okay.

19     MS. RAJAPAKSE:  -- because the judge stated that had

20 I had mentioned that I did not owe them, that I would -- he

21 would have decided in my favor, because it had -- it had came

22 out that the property manager, while I was attempting to be

23 gone December the 1st --

24     THE COURT:  Um-hmm.

25     MS. RAJAPAKSE:  -- that the property manager was

Case 1:21-cv-00158-CLC-CHS   Document 11-1   Filed 08/31/21   Page 24 of 44   PageID #: 79

1    telling potential landlords that I was a -- I was already

2    evicted from the property. So, because he had said that, he

3    said that because I did not actually state that I do not owe

4    them, that he sided with them and ordered me to file an appeal,

5    which I did. I filed it February the 11th. I moved out

6    February the 12th and -- because I was about to be homeless. I

7    didn't have anywhere to go.

8            THE COURT: Have you -- did you find a place to live,

9    ma'am?

10           MS. RAJAPAKSE: Yes, I did. I found a place on

11   February the 12th, and we -- I signed the lease, and I moved in

12   from there. When I -- as I was attempting to leave the

13   apartment, this is where during the appeal -- during the --

14   after the general sessions, during the appeal, as I was

15   attempting to leave on the 12th, I kept getting harassing phone

16   calls, e-mails from -- I'm sorry, e-mails from the property

17   manager demanding that I leave right then and there. My -- the

18   movers was moving at 3:00. And I called general sessions and

19   let them know that -- you know, to get a clarification on my

20   rights, you know, "Do I have to leave in a hour?"

21           They said, "No, you have to be gone by

22   12:00 midnight, but you cannot go beyond the next day."

23           Well, prior to that, it was already agreed that it

24   was a holiday, I was going to move out on the 12th, they were

25   closed that Saturday and Sunday, so I'll return the keys that

1  Monday and do the walk-through.  Well, that didn't happen.  On

2  the 12th I got harassed.  Five days--  During the ten days I

3  got -- had people knocking on my doors, telling me that --

4  asking for my name.  I didn't know anybody there, men.  So I

5  -- I didn't know what else to do.  So when I left there, I

6  cleaned the place up, didn't -- everything was just as it was,

7  when I moved out, and the property manager kept e-mailing me

8  asking --

9         THE COURT:  So you were ordered by the sessions court

10 to be evicted by a certain date --

11        MS. RAJAPAKSE:  Yes.

12        THE COURT:  -- and you stayed a few days after?

13        MS. RAJAPAKSE:  No, I didn't, Your Honor.  I --

14        THE COURT:  You were out by the date the court

15 ordered you to be out?

16        MS. RAJAPAKSE:  I was out by the date, yeah, but I

17 still had the keys, because, again, it was a holiday.  When I

18 moved out, it was 11:50 that night.  When I completely cleaned

19 out the apartment, cleaned up everything, and had everything

20 out of the apartment, it was -- it was February the 12th at

21 11:40.

22        THE COURT:  Okay.  And you haven't--  You moved out

23 on February 12th at 11:40 and --

24        MS. RAJAPAKSE:  And I gave the keys back.

25        THE COURT:  Okay.  And you haven't lived there since?

1          MS. RAJAPAKSE:  No, I haven't.

2          THE COURT:  And how much money does Royal Arms

3    contend that you owe them?

4          MS. RAJAPAKSE:  They said I owe a thousand -- he said

5    at first in a letter that I owe close to $3000 --

6          THE COURT:  Okay.

7          MS. RAJAPAKSE:  -- I did $3000 in damage.  And then

8    on my credit --

9          THE COURT:  They say that you did damages to the

10   apartment?

11         MS. RAJAPAKSE:  Yes, sir.

12         THE COURT:  And how much of that do they say is

13   unpaid rent?

14         MS. RAJAPAKSE:  They said it was seven sixty-two

15   rent.

16         THE COURT:  Okay.  Did the court grant -- to your

17   knowledge, is there any judgment against you in a court of law

18   for that amount of money?

19         MS. RAJAPAKSE:  Yes, it is, Your Honor.

20         THE COURT:  Okay.  And who -- who put that order

21   down?  The general sessions court?

22         MS. RAJAPAKSE:  General sessions did.

23         THE COURT:  All right.

24         MS. RAJAPAKSE:  And this is with the ev- -- some of

25   the evidence that I showed them.  So I appealed in general --

1  circuit court on the 11th.

2          THE COURT:  And they dismissed it, ultimately.

3          MS. RAJAPAKSE:  They dis- -- well, let me explain

4  what happened, Your Honor.

5          THE COURT:  Well, you're going in a little bit too

6  much detail.  I mean, what I need to know, you had a judgment

7  rendered against you in sessions court, you appealed -- you

8  appealed that decision to the circuit court, which you had

9  every right to do.  You apparently did it in a timely manner.

10  You had to do it within ten days.  And the circuit court

11  ultimately granted a motion dismissing your complaint?

12          MS. RAJAPAKSE:  No, they never heard it, Your Honor.

13          THE COURT:  Well, I'm not -- I'm not asking you

14  whether they had a hearing on it.  I'm asking whether they

15  entered an order.

16          MS. RAJAPAKSE:  Well, I found out that it was

17  dismissed and it was -- I sent -- I received a letter saying

18  that it was -- I had a trial in July.  I did file something in

19  that court telling them what happened in general sessions.  And

20  when I went in March, because I -- I got a -- when I filed it

21  in March, the detail, that's when I found out I had a court

22  date.  By the time that I went to the court date, I found out

23  that it was already dismissed, it was -- it was -- it had been

24  dissed -- dismissed over a month.  So I filed a motion and

25  asked the Court to set aside an order because I hadn't received

1   anything.  And I was told that neither party had any -- any

2   responsibility to notify me.

3           So I got a continuance and -- oh, when I got a

4   continuance again, I -- I asked the court how could I not --

5   how could I defend something, I wasn't even notified of court

6   hearings?  So when I got a continuance and -- that's when I

7   filed in this court, because I was entitled under -- I'm

8   entitled to my -- my right of due process.

9           Now, I understand that -- that the adversary doors

10  were opened for me, but, Your Honor, if I don't -- if I don't

11  know the process, if you not telling me when I have to go to

12  court, when I have to be in court when it's filed -- the

13  defendants did not -- Mr. Wagner did not give me a copy of

14  anything.  It was after I filed in this court and I started

15  talking about the behavior of state court that I started

16  receiving information about this.  That's when I started

17  receiving court dates from them, after I filed here.  Then

18  after I filed here and after they filed a motion for a

19  dismissal and I filed a motion stating that -- what the court

20  ordered, the court ordered us to talk before anybody could

21  file anything, that's when Ms. Shea came aboard.  She wasn't

22  the original counsel.

23          THE COURT:  That doesn't matter, ma'am.

24          MS. RAJAPAKSE:  Well, yes, it does, Your Honor.

25          THE COURT:  No, it doesn't.  She can -- she can

1  substitute in at any point.

2          MS. RAJAPAKSE:  I understand that, Your Honor, but

3  the information that she's provided to you was -- was -- is

4  literally false.  She said that I filed something, and that has

5  a bearing on that.

6          THE COURT:  I understand.  Well, we're going to --

7  we'll rely upon the records that are before the Court, but my

8  question is, have you filed everything with the Court that you

9  intend to file in support of the motions that you have filed?

10          MS. RAJAPAKSE:  Well, Your Honor, she's -- the only

11  thing that I -- I did file something stating about a state of

12  claim -- failure to state a claim.  I did file that in court.

13  But the September the 8th docket of -- her having it to

14  dismiss, I -- that's something -- if she's filed it, I never

15  received it.

16          So I'm asking you, could you send it--

17          If she could send me another copy within -- by

18  Monday, I can file my response.  But I did file an answer.

19  When I filed their answer, I did file that motion.  I did

20  state in there --

21          THE COURT:  What is it that you contend that you have

22  not received?  I'm sorry.

23          MS. RAJAPAKSE:  She's--  It says a docket --

24  September the 8th docket for failure to state a claim.

25          MS. WELFORD:  Again, Ms. Rajapakse has responded --

```
1            MS. RAJAPAKSE:  Okay.

2            MS. WELFORD:  -- to that.

3            You've--

4            Ms. Rajapakse has submitted --

5            MS. RAJAPAKSE:  Okay.  So that was attached with

6     that?

7            MS. WELFORD:  -- numerous responses to that filing.

8            Yes.

9            MS. RAJAPAKSE:  Okay.  I thought it was just a

10    separate motion from that, but --

11           THE COURT:  Okay.  It sounds like you have gotten --

12           MS. WELFORD:  That's -- yeah, that's the motion on

13    the basis of res judicata.

14           MS. RAJAPAKSE:  Okay.

15           THE COURT:  How are you sending her--  Do you have

16    her correct address?

17           MS. RAJAPAKSE:  Yeah, we go by e-mail, Your Honor.

18           MS. WELFORD:  Your Honor, Ms. Rajapakse doesn't want

19    to disclose her physical address.

20           THE COURT:  Okay.  I -- as long as you've got some

21    way to verify that you're sending it and she's receiving it.

22    You-all do this by e-mail?  You send her e-mails with

23    attachments?

24           MS. WELFORD:  E-mails, and then I send a paper copy

25    to her P. O. Box, and then I usually discuss it with
```

1  Ms. Rajapakse, if possible, so --

2          THE COURT:  Are you sending it certified mail?

3          MS. WELFORD:  No, Your Honor.

4          THE COURT:  You might want to do that, just -- just

5  to make sure that, you know, we have verification.

6          MS. WELFORD:  But that one -- just -- if I can have

7  leave to address Ms. Rajapakse.

8          That's the motion to dismiss on the basis of

9  res judicata --

10          MS. RAJAPAKSE:  Okay.  I just thought --

11          MS. WELFORD:  -- that September 8th, and you've

12  responded to that.

13          MS. RAJAPAKSE:  Okay.  I just thought it was a

14  separate motion.

15          THE COURT:  Okay.  I understand.

16          MS. RAJAPAKSE:  Okay.  But, Your Honor, getting back

17  to what the state court says, there's a doctrine called the

18  Rooker-Feldman docket.  And the Rooker-Feldman docket talks --

19  doctrine, I'm sorry, talks -- speaks on the behavior of the

20  court, the adjudication of the court, and how it's related to

21  federal court.  The -- the Rooker-Feldman doctrine -- I'm sorry

22  for that, because I-- I can see clearly.  I have to put my

23  glasses on.

24          THE COURT:  That's fine.

25          MS. RAJAPAKSE:  The Rooker-Feldman doctrine

1  precludes -- it speaks about the process of the eviction in --

2  in dis- -- in federal court.  Now, this is very particular

3  because it states that that -- the eviction process, even

4  though if a person may or may not address certain issues in

5  state court, that the Rooker-Feldman doctrine could -- it could

6  be addressed in this court.  Now, at the time that I was in

7  general sessions, I had no knowledge that they were -- they

8  were using -- they were fixing -- they was about to fix the

9  apartment up to move a tenant in, a white tenant in, after I

10 left.  I didn't know that.  I didn't know that after I left

11 that they were going to evict the white tenant above me, and

12 for the same issues that I had.  Had I had known that, that all

13 of these things occurred prior to me filing in general

14 sessions, I would have did that.  But I -- at that time I

15 didn't have no reason to do that because the only thing that

16 was at that -- at the issue was the Tennessee Uniform Codes

17 Act.  So I couldn't use housing discrimination if I didn't have

18 proof that it exist while I'm dealing with Tennessee law.  So

19 at that time, that -- that law, that act, was sufficient, it's

20 sufficient.  Now, the Tennessee act, the uniform act, says at

21 any time that there is some -- that the housing become

22 unsubstanduary, that I have a right to seek secondary home --

23 housing, and that I don't have to pay the -- my landlord.

24 That's in -- that's in the rule.  So I didn't do anything

25 wrong, because they refused to fix the rodents in the wall, the

Case 1:21-cv-00158-CLC-CHS   Document 11-1   Filed 08/31/21   Page 33 of 44   PageID #: 88

1    tenants was loud, my enjoyment of peace, it was affecting my

2    employment, so I had a right to give them notice, I had a right

3    to leave. So I did that.

4           Now, how it changed to the Fair Housing is that

5    after I moved out, then I -- I get information that's -- that

6    supports that this is what happened. Why couldn't they have--

7    So my thing, yes, it does come into the Fair Housing, because

8    if they fixed this apartment up for this white resident to

9    live in and they evicted the people above me, they -- they got

10   rid of the woman -- the people that had the tenants that --

11   that had the urine stain, why couldn't they have done it for

12   me? Did it matter if I paid rent and paid the late fees? I

13   did. I paid my rent. If I was late, the penalty of that is

14   not to have me evicted. They had a right to put a late charge

15   on me, and they did, and I paid it. But Tennessee also have

16   what they call constructive eviction, when you complain so

17   much that --

18          THE COURT: I -- I know what it is. Okay. I have --

19   I've let you go a little bit beyond what -- I'm actually more

20   concerned with the procedural issues today than letting you-all

21   argue your case in full. But I want -- I want you to feel like

22   you're being heard, and it's important to me that I know what

23   your complaint is. And I do understand what your complaint is.

24          Why don't you have a seat for a second and let me

25   tell you what I am going to do, and I'll also make a

1  suggestion to you-all.  I fully appreciate, Ms. Rajapakse,

2  that you feel wronged.  And I'll give you a little feedback.

3  I mean, you feel like the -- there were maybe some

4  misrepresentations made to you when you came to that apartment

5  complex, your condition -- your living conditions during the

6  time that you lived there were unacceptable, there were

7  rodents, there was noise, there was the smell of urine, there

8  were things that you found to be -- to make the apartment

9  virtually uninhabitable.  Based on what you're telling me, it

10  sounds like you're better off not living there than living

11  there, but I'm not making any findings along those lines at

12  this point.  So at some point they claim that you were late on

13  your -- the money that you needed to pay them to stay there.

14  They -- they, it sounds like, lawfully filed an action in

15  sessions court to evict you, and the judge there, for whatever

16  reason, decided that they could evict you.  And it sounds like

17  you were evicted in a timely manner.  And there may be some

18  questions of fact about all that, but that's a basic

19  understanding.  And then you claim that after you moved out,

20  they fixed the apartment up.  It sounds like they're saying

21  that you damaged the apartment, and that's probably part of

22  their defense.  They would say that the reason they had to fix

23  it up was because you damaged it.  I understand that you

24  disagree with that.  You claim that the reason that they --

25  they fixed it up was because it was a white person moving in.

1   And you also mentioned that the white tenant above you, who

2   was making a lot of noise and causing the sound of furniture

3   moving and so forth, that they evicted that person.  And

4   sounds -- and I'm reading between the lines but understanding

5   you to say that it would be -- have been much better if they

6   evicted that person while you were still living there, so you

7   didn't have to deal with all that noise.

8           So as things stand right now, the -- Lexington is

9   claiming that you owe them some amount of money that -- that

10  was reduced to a judgment, apparently a general sessions court

11  judgment, and probably affirmed by the circuit court and later

12  by the court of appeals.

13          MS. RAJAPAKSE:  Well, Your Honor, may I -- may I

14  object --

15          THE COURT:  Well, how much --

16          MS. RAJAPAKSE:  -- because I -- it never -- I -- when

17  I found out that the -- when I found out that the case was -- I

18  didn't know that -- that the appellate court was -- still had

19  the case open.  And when I found out, I called the clerk, she

20  told me it was, I asked her was there any pending motion -- or

21  orders.  She said it was not.  So I expedited the motion to

22  dismiss because Ms. Welford has stated to me she was going to

23  ask this court to stay pending the appellate court, and I was

24  already in this court.  And -- and for the record, all the --

25  the evidence that I'm telling you about, the -- as far as

1   the -- every document, it's --

2          THE COURT:  Ms. Rajapakse --

3          MS. RAJAPAKSE:  -- it's in there.

4          THE COURT:  -- I don't want to give you -- I mean,

5   I've listened to you, ma'am, but I'm not staying anything over

6   in state court.  I'm not trying to stay something that's

7   happening in the Tennessee Court of Appeals.  And my

8   understanding is, the Tennessee Court of Appeals has ruled on

9   this -- on this case.

10         Have they ruled on this case, Ms. Welford?

11         MS. WELFORD:  They dismissed the case, Your Honor.

12         THE COURT:  They dismissed the case.

13         MS. RAJAPAKSE:  They dismissed it at -- at my motion,

14  Your Honor, and I submitted that in court.

15         THE COURT:  Well, it's dismissed.  Whatever judgment

16  was entered in state court is final, from my understanding.

17         MS. RAJAPAKSE:  Yes, it is.

18         THE COURT:  Okay.  And how much is the amount of the

19  judgment?

20         MS. WELFORD:  Your Honor, both of the general

21  sessions judgments are attached to our motion to dismiss

22  papers, and the amount is $1090.74 plus costs and taxes and a

23  judgment for possession.

24         THE COURT:  All right.  Have you done anything to

25  collect on that judgment?

1      MS. WELFORD:  Your Honor, I have not, but Mr. Wagner

2  may have.  I don't handle the collection --

3      THE COURT:  Okay.  The collection part.

4      And you haven't --  you haven't done anything to pay

5  this judgment?

6      MS. RAJAPAKSE:  I -- well, Your Honor, I have been

7  paying -- I've been paying circuit court, their court fees, and

8  I've been paying the appellate court.  And because I did not --

9  there was no order -- like I said, again, I asked for the court

10 to dismiss it, and the order was rendered on my motion.  I'm --

11     THE COURT:  It doesn't matter.  It doesn't matter who

12 asked that it be dismissed.  All that matters is that the

13 judgment has become final over in state court.

14     MS. RAJAPAKSE:  May I ask a question, Your Honor?

15     THE COURT:  Umm.

16     MS. RAJAPAKSE:  Because it seem like, to me, at this

17 point it seem like the Court is more concerned about the fact

18 that they evicted me, that I owe them.  It's not as if the--

19 It's as if the Tennessee Uniform Act does not apply to me.

20 That's what it seem like it's --

21     THE COURT:  No, what I'm trying to determine is if --

22     MS. RAJAPAKSE:  May I --

23     THE COURT:  -- it's been litigated over in state

24 court.

25     MS. RAJAPAKSE:  But, Your Honor, it -- that's the --

1  that's what I had put in my complaint in this case, that it

2  wasn't litigated, because if it was litigated -- if it was

3  litigated and it was litigated under my rights to equal

4  protection, I wouldn't be in this court.  I have--  But it --

5            THE COURT:  Let me ask you this.  One of the things I

6  do oftentimes is try to help bring the parties together to see

7  if there is common ground.  And I understand what your

8  complaint is and I understand what the defendant's position is.

9  And you're not suing to try to get back in that apartment

10  complex, are you?

11           MS. RAJAPAKSE:  No, sir.

12           THE COURT:  What are--  You're suing for monetary

13  damages?

14           MS. RAJAPAKSE:  Yes, sir, because --

15           THE COURT:  What do you think your monetary damages

16  are?

17           MS. RAJAPAKSE:  My monetary damages?

18           THE COURT:  Yes, ma'am.  How much do you --

19           MS. RAJAPAKSE:  Well, I was out -- well, if we're

20  just talking about the moving itself, I was out $3300, and that

21  was because I had to find a place, I mean, you know -- if they

22  had to just let me out of the lease, I -- I mean, it would have

23  been easier, but when I had to -- I had to hurry up and find a

24  place, I had to hurry up and move my stuff, everything had to

25  come within those ten days of -- of moving.  So the moving

1  itself and -- was not just -- it was just mon- -- $3300, and

2  that's money that I had to just come up with.

3         THE COURT:  Well, let me ask you this.  Have you-all

4  talked settlement at all?

5         MS. WELFORD:  No, Your Honor.  Ms. Rajapakse has

6  (inaudible) with the Department of Housing and Urban

7  Development regarding the Fair Housing Claim (inaudible) there

8  as well -- (Inaudible.)

9         THE COURT:  Um-hmm.

10         MS. WELFORD:  And on that track Royal Arms has

11  responded and we're in proceedings on that.  Once a

12  determination is made in that proceeding, it can go to federal

13  court.  If this case, though, has concluded, that will conclude

14  that matter as well.  And I don't believe it's now within

15  Ms. Rajapakse's control, I don't think, to do anything about

16  that Fair Housing claim.

17         THE COURT:  Right.

18         MS. WELFORD:  So we are proceeding on this as it will

19  take care of both of those (inaudible) --

20         THE COURT:  A Fair Housing Act claim is like an EEOC

21  claim; once you've filed it, it's really the -- the agency has

22  the right to pursue it or not pursue it.

23         MS. WELFORD:  Correct, Your Honor.  So if we were

24  able to enter into a settlement which Your Honor in almost all

25  of my cases I would say I'd be willing to sit down and talk and

1  mediate, we would still have this other problem (inaudible) --

2  　　　　　THE COURT:  Well, if you guys settled your case here

3  and entered a voluntary motion -- order of dismissal, didn't

4  you just indicate to me that if the case is resolved in federal

5  court, the Fair Housing Act -- the agency would dismiss its

6  claim?

7  　　　　　MS. RAJAPAKSE:  That's not necessary--  That's not

8  correct, Your Honor.

9  　　　　　THE COURT:  Well, I -- yeah, maybe that --

10 　　　　　MS. RAJAPAKSE:  May I explain?  The Fair Housing Act,

11 the HUD Department, states that I can file in federal court and

12 still have a claim.  They -- they said -- they stated that

13 they're in -- they investigated.  The evidence that I submitted

14 found that they -- that there was high risk of me being

15 discriminated.  This was -- this was after the fact, with all

16 the evidence, including the audio that the Court has, of -- of

17 everything.  So, from that --

18 　　　　　THE COURT:  You're saying that the --

19 　　　　　MS. RAJAPAKSE:  But -- but --

20 　　　　　THE COURT:  -- agency has made findings?

21 　　　　　MS. RAJAPAKSE:  No, they haven't, but they -- they

22 initi- --

23 　　　　　THE COURT:  You just told me they made a --

24 　　　　　MS. RAJAPAKSE:  Let me start all over.  During the

25 initial --

Case 1:21-cv-00158-CLC-CHS   Document 11-1   Filed 08/31/21   Page 41 of 44   PageID #: 96

1          THE COURT:  Ms. Rajapakse, did you just tell me that
2     they made findings?  Did you --
3          MS. RAJAPAKSE:  Yes, they did.  Yes, they did, Your
4     Honor.  They --
5          THE COURT:  When did they make those findings?
6          MS. RAJAPAKSE:  Let me--  I'm getting ready to
7     explain to you.  When I filed the initial complaint, they asked
8     me to submit evidence to show that if -- if I had a claim for
9     housing discrimination.
10          THE COURT:  Right.  So you did that, right?
11          MS. RAJAPAKSE:  I did.  At that point I received a
12     letter saying that they found evidence of -- but they was
13     waiting on the defendants to submit other additional evidence
14     that --
15          THE COURT:  Right.
16          MS. RAJAPAKSE:  -- their side.  At this point we
17     still in court.  At this point they haven't submitted anything
18     to HUD nor this Court to support their claim that it was not
19     discrimination.
20          THE COURT:  Okay.
21          MS. RAJAPAKSE:  I was --
22          THE COURT:  So HUD has heard your side of the story,
23     but they haven't heard --
24          MS. RAJAPAKSE:  Yes, sir.  At this point --
25          THE COURT:  (Inaudible.)  You're talking over me,

1    Ms. Rajapakse.

2              MS. RAJAPAKSE:  I'm sorry.  I'm so sorry.

3              THE COURT:  I'm giving you far more leeway than I've

4    ever given --

5              MS. RAJAPAKSE:  I'm sorry, Your Honor.  I just want

6    to make sure I --

7              THE COURT:  Stop talking for a moment.

8              MS. RAJAPAKSE:  Okay.

9              THE COURT:  So HUD has not issued any findings with

10   respect to your claim, have they?

11             MS. RAJAPAKSE:  No, they haven't.

12             THE COURT:  All right.  I would encourage the parties

13   to discuss settlement.  This is-- Right now they have a

14   judgment against you for something over a thousand dollars.

15   They can enforce that judgment and make you pay it.  You're

16   asking that the Court award damages against them, which you may

17   or may not get.  Seems to me that there is a basis for the

18   parties -- for you to dismiss your claim for damages against

19   her and for her to consider taking that as a settlement to walk

20   away from this claim.  You guys ought to discuss that.  I

21   encourage all parties to try to resolve their cases.  But if

22   you can't-- If you do that, let me know, and we'll take note

23   of that and enter an appropriate order.  If you don't, here's

24   what I'm going to do; I'm going to go ahead and hold further

25   proceedings in abeyance.

1          Ms. Welford, don't file anything else.

2          MS. WELFORD:  Yes, Your Honor.

3          THE COURT:  Ms. Rajapakse, don't file anything else.

4          I'm going to look at all of the motions and the

5    filings that are before the Court, and I'm going to enter

6    orders on each of those.  And then, depending on what we do,

7    we will hold a further scheduling conference with the parties

8    to get the case back on track after we have ruled on all of

9    the motions pending right now.  So that's what we're going to

10   do.  And thank you both for being here today.  And we'll be

11   back in touch.  If you are successful in settling the case,

12   please let me know.

13         MS. WELFORD:  Yes, Your Honor.

14         THE COURT:  Thank you.

15                         END OF PROCEEDINGS

16

17

18

19

20

21

22

23

24

25